United States District Court
Southern District of Texas
**ENTERED**
December 19, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| SARAH LEIGH CASTREJON, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:17-CV-132 |
| | § | |
| SOCIAL SECURITY | § | |
| ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Sarah Leigh Castrejon, proceeding *pro se*, filed a complaint seeking reversal of the decision of the defendant Commissioner of Social Security (Commissioner) for the purpose of receiving Supplemental Security Income (SSI). The parties were ordered to file briefs and Plaintiff filed a short statement asking to be granted SSI benefits and a copy of lab slip showing she has a diagnosis of "major depressive disorder" (D.E. 11). Defendant filed a response brief in support of the Commissioner's determination on October 4, 2017 (D.E. 12). For the reasons discussed below, it is respectfully recommended that the Commissioner's decision be affirmed and Plaintiff's cause of action be dismissed.

## BACKGROUND

Plaintiff filed an application for SSI on June 23, 2014, alleging an onset date of January 1, 1997, later amended to July 23, 2014 (Tr. 12, 28; D.E. 9-3 at pp. 12, 29). The application was denied at all levels of the administrative process (Tr. 100-103, 109-112, 12-20, 1-3; D.E. 9-5 at pp. 3-6, 12-15, D.E. 9-3 at pp. 13-21, 2-4). Plaintiff filed this civil

action seeking reversal of the Administrative Law Judge (ALJ) decision on April 13, 2017 (D.E. 1).

Plaintiff alleges that she has been unable to work since July 23, 2014 because of depression, schizophrenia, and bipolar disorder (Tr. 68; D.E. 9-4 at p. 2 ).  Her reported symptoms include crying easily and for no apparent reason, insomnia, sleeping too much, anxiety, fearfulness, and an inability to concentrate (Tr. 217-224; D.E. 9-7 at pp. 31-38).

Plaintiff has no prior work history, in part because she spent much of her youth in a juvenile detention facility and also served five years in prison as an adult following a conviction for aggravated assault (Tr. 29; D.E. 9-3 at p. 30).

## MEDICAL EVIDENCE

The medical records for Plaintiff begin in August 2013, while she was incarcerated and receiving outpatient treatment for mental health issues.  She was taking Sertraline 100mg.[1] (Tr. 255; D.E. 9-8 at p. 3).  She described her depression symptoms as crying episodes, sleeping a lot, eating a lot, and not wanting to do anything.  She had experienced the symptoms for the previous three weeks.  Records showed that she was only seventy percent compliant with her medication regimen and she was advised to increase compliance to eighty-five percent before a medication increase would be considered (Tr. 256; D.E. 9-8 at pp. 4).   A mental status examination showed that her facial expression was constricted and her attitude toward the examiner was resistant,

---

[1] Sertraline is the generic form of Zoloft.  https://www.drugs.com/sertraline.html (last viewed on December 14, 2017).

defensive, and manipulative.   She exhibited poor judgment and irresponsible social maturity (Tr. 256-257; D.E. 9-8 at pp. 4-5).

Plaintiff continued to be seen by mental health care providers while she was incarcerated.  In October 2013 Plaintiff described her depression as a "5/10."  She was twenty-seven years old and had last engaged in self harm when she was seventeen.  Her depression caused her to be lethargic and not want to get out of bed.  She also had frequent nightmares about her daughter being taken from her.  She was described as "calm, engaging, and cooperative" and her mental status examination was normal except for being depressed with a slightly blunted affect.  She requested an increase in her medication and the Sertraline was increased to 150 mg. (Tr. 262-268; Tr. 10-17).

Plaintiff saw staff at mental health care services three times in 2014, describing herself as depressed, tearful, and sometimes angry for no reason.  Her mental status examination showed her to be without clinically significant signs of depression, psychosis, distress, or aggression, and with no homicidal or suicidal ideation (Tr. 271, 275, 280; D.E. 9-8 at pp. 19, 23, 28).

Plaintiff was released from prison on June 20, 2014 after having been incarcerated for five years and shortly thereafter sought mental health care services from Nueces County Mental Health and Mental Retardation (MHMR) (Tr. 318; D.E. 9-8 at p. 66).  Plaintiff reported symptoms of starting on one thing and going on to other things with the result that it took her a long time to get things done.  She also experienced anger, anxiety, impulsivity, social isolation, and feelings of social inadequacy (*Id.*).

Plaintiff denied hallucinations, but said she was delusional, believing that people were out to get her and that her parents were trying to take her daughter away from her. She reported having attempted suicide when she was younger, but said she had been seeking attention.  She had no current suicidal or homicidal ideations.  Plaintiff said that she was first diagnosed with bipolar disorder in 2001 along with oppositional defiant disorder.  In 2007 she was "using a lot of drugs" and her diagnosis was changed to schizophrenia, paranoid type, with borderline personality disorder.  It was noted in the intake notes that Plaintiff previously had been seen at MHMR and had last been treated in 2009 by a psychiatrist for schizophrenia, paranoid type (*Id.*).

Plaintiff said that she had been hit by a car when she was nine years old and had been in a coma for a while with head trauma (Tr. 319; D.E. 9-8 at p. 67).  Prior to her incarceration she had used illegal drugs frequently, but currently had no desire or craving for drugs (Tr. 321; D.E. 9-8 at p. 69).  She reported that she had obtained a GED while in prison and had almost completed an accounting course (Tr. 322; D.E. 9-8 at p. 70). Plaintiff did not describe herself as being in crisis and said that she had support from her family, a stable residence, spiritual beliefs, and coping skills, including deep breathing and cleaning (Tr. 323; D.E. 9-8 at p. 71).

On August 29, 2014 Plaintiff underwent a mental status examination with Christopher Klaas, Ph.D.  Her chief complaint was depression and she added, "they say I'm bipolar."  She reported numerous hospital admissions for psychiatric illness and said she had attempted suicide twelve times but had no current thoughts of suicide.  She could not maintain employment because she did not have her medications and could not

understand what people told her to do (Tr. 286; D.E. 9-8 at p. 34).   She had some difficulty organizing her thoughts and maintaining focus and her concentration was described as "fair."  (Tr. 287; D.E. 9-8 at p. 35).

She explained that her mental health had been variable over the past year and her family helped her to manage stress.  Examination showed that she had fair psychological accessibility; her demeanor was anxious but amenable; her statements were clearly articulated, not logically sequenced and mostly briefly expanded; her statements included frequent tangential references; her verbal reasoning was constrained; she had a constrained fund of knowledge and appeared to function intellectually in the borderline range; and her judgment and insight were limited.  She was not psychotic and denied hallucinations (Tr. 288-289; D.E. 9-8 at pp. 36-37).   Dr. Klaas diagnosed Plaintiff with Bipolar 1 Disorder, moderately severe, most recent episode manic with borderline intellectual functioning (Tr. 289; D.E. 9-8 at p.37).   Dr. Klaas thought Plaintiff understood the meaning of filing for benefits but could not manage benefit payments in her own interest (Tr. 285; D.E. 9-8 at p. 33).

In November 2014 Plaintiff saw psychiatrist Jack Chelebian at MHMR.  She was appropriately dressed and groomed and was cooperative.  Her examination was within normal limits and it was noted that her depression was improving (Tr. 385-390; D.E. 9-9 at pp. 6-11).  Plaintiff saw Dr. Chelebian again in January 2015.  She reported that she was sleeping too much and not eating enough (Tr. 339; D.E. 9-8 at p. 87).  She was stable on Zoloft 200 mg. but complained of vague side effects.  She was appropriately dressed and groomed; her speech and thought processes were within normal limits; her judgment

and insight were fair; her fund of knowledge was adequate; and her mood and affect were euthymic (Tr. 340-344; D.E. 9-8 at pp. 88-92).   She was diagnosed with Major Depressive Disorder, severe, without psychosis and polysubstance dependence, in remission.   She had a GAF of 65 and a past year GAF of 55[2] (Tr. 345; D.E. 9-8 at p. 93). Her Zoloft was decreased to 150 mg. (Tr. 347; D.E. 9-8 at p. 95).

In January 2015 Plaintiff went to MHMR to refill a prescription and reported that she had stable support but was anxious about the outcome of her SSI application.   She reported that her mood was fine and her affect was cooperative and euthymic.   She was appropriately dressed and groomed (Tr. 338; D.E. 9-8 at p. 86).

Plaintiff saw psychiatrist Raul Capitaine in March 2015.   She reported social phobia and panic attacks causing her to be very uncomfortable in public and around people she does not know.   She alternated quickly from happy to sad and became angry easily.   Panic attacks caused her to cry and feel like she could not breathe.   She did not

---

[2] The Global Assessment of Functioning ("GAF") scale rates overall psychological functioning on a scale of 0-100.   A GAF of 61 to 70 indicates mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful personal relationships.   A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).   *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Ed., 2000.   The American Psychiatric Association dropped the GAF Scale in favor of the World Health Organization Disability Assessment Schedule (WHODAS) 2.0.   *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013)(DSM-5);   *Braswell v. Berryhill*, No 5:16-CV-033-BQ, 2017 WL 881109, n. 1 (N.D. Tex. 2017).   However, because Plaintiff's mental health care providers assessed her with reference to the GAF Scale, and because the ALJ mentioned the GAF numbers in the record, they are included here.

hear voices or have trouble sleeping.  She was taking Zoloft 200 mg.  (Tr. 371; D.E. 9-8 at 119).

Plaintiff reported that she had been hospitalized a total of seven times.  She also was treated at MHMR from ages eleven to fifteen and received treatment while incarcerated as a juvenile.  She attempted suicide by cutting her wrists and pretending to hang herself but described the behavior as attention seeking (Tr. 371; D.E. 9-8 at p. 119).

She previously drank alcohol and abused drugs but stopped when she got pregnant and was not currently using either (Tr. 372; D.E. 9-8 at p. 120).  She went to prison for assault after several violent encounters with women over men, all fueled by her intense anger.  She obtained a GED and completed an accounting course with the U.S. Career Institute  (Tr. 372-373; D.E. at pp. 120-121).  Dr. Capitaine diagnosed her with Bipolar disorder with psychotic features--paranoid, and assessed her with a GAF of 45[3] (Tr. 373-374; D.E. 9-8 at pp. 122-123).

Plaintiff continued to see Dr. Capitaine and in August 2015 she reported being depressed, irritable, and staying in bed.  He prescribed Wellbutrin XL 50 mg., Remeron 30 mg., Trazadone 150 mg., and Xanax 1 mg. (Tr. 367-368; D.E. 9-8 at pp. 115-116).  He discontinued the Trazadone and increased the Wellbutrin in September 2015 (Tr. 366; D.E. 9-8 at p. 114).  In December 2015 Dr. Capitaine completed a form as part of Plaintiff's disability application and indicated that she was unable to work or participate

---

[3] A GAF of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Ed., 2000.

in activities to prepare for work, but the disability was not permanent and was expected to last six months or less.  Her diagnoses were Bipolar disorder and generalized anxiety disorder (Tr. 377-378; D.E. 9-8 at pp. 125-126).

Plaintiff submitted a form from the Texas Health and Human Services Commission which was signed by a psychiatrist, D. Badea-Mic, on March 6, 2017.  The form indicates that Plaintiff has been diagnosed with major depression with psychosis and that the impairment is permanently disabling (D.E. 1 at pp. 7-8).  There is no further information from Dr. Badea-Mic in the record.

## HEARING TESTIMONY

Plaintiff, represented by counsel, attended a hearing on September 10, 2015.  A vocational expert (VE) also attended the hearing.  The attorney stated that Plaintiff had received SSI from the age of seventeen to twenty-two when she went to prison (Tr. 29; D.E. 9-3 at p. 30).

Plaintiff testified that she lived with her seven-year-old daughter, her mother, and her stepfather (Tr. 31; D.E. 9-3 at p. 32).  Her mother had a vision problem but Plaintiff did not have to help her.  Plaintiff was not sure what grade she had completed in school, but she obtained a GED while she was in prison.  She had taken an accounting class through the U.S. Career Institute while in prison but had not finished it.

Plaintiff had worked for two-and-a-half weeks at a non-profit organization as part of a job training program, but she got depressed and had bad anxiety.  She could not remember what she was supposed to do even though she would write down instructions (Tr. 32-33, 41; D.E. 9-3 at pp. 33-34, 42).  When they would tell her to do something, she

would have to do it in a way that made her comfortable or she could not remember how to do it (Tr. 39-40; D.E. 9-3 at pp. 40-41).  The food stamps she received on behalf of her daughter were contingent on completing the training but she was unable to finish it (Tr. 42; D.E. 9-3 at p. 43).

Plaintiff sees Dr. Capitaine because she feels very sad and gets her feelings hurt very easily.  She is sad every day, unless she feels happy about something.  When she is around other people her chest hurts and she gets a lump in her throat.  She does not feel that way when she is at home unless she gets angry (Tr. 35-36; D.E. 9-3 at pp. 36-37).  She believes that her medication helps her and her mother tells her that she does not appear to be as angry (Tr. 37; D.E. 9-3 at p. 38).

When she is at home she cleans the house and does laundry.  She does not cook because her mother cooks for the family and the food Plaintiff prepares does not taste good.  She does not see anyone outside the house.  She is able to take care of her daughter.  Plaintiff believes that she sleeps too much because she sometimes sleeps up to seventeen or eighteen hours a day, although she is not sure of the exact number of hours (Tr. 37-39, 45; D.E. 9-3 at pp. 38-40, 46).  She does not have problems getting along with people and "love[s] everybody."  (Tr. 39; D.E. 9-3 at p. 40).

She did not believe she could have a job washing dishes in a restaurant because she has to do it in a particular way.  At home, she soaks dishes in bleach for twenty minutes and then washes them in soap and water.  If she does not believe they are clean, she has to wash them again.  She would not be able to let people eat off dishes she believed were dirty (Tr. 43; D.E. 9-3 at p. 44).

When she has a panic attack her chest becomes very tight and it feels like she cannot breathe or move and her jaw and shoulder start hurting.  She feels like she is going to die.  She had panic attacks when she was training at the non-profit because she felt like they expected her to learn too much about how to use a computer in six weeks.  In five years of prison she could not learn how to bake or cook which was her job (Tr. 44; D.E. 9-3 at p. 45).

Plaintiff's parents do most of the care-taking of her daughter.  Plaintiff has a driver's license and can drive, but only goes to the grocery store and Walmart.  She loves to go to the store and shop because people do not tell her what to do.  If someone looks at her she just looks back at them in a way that says, "Leave me alone."  (Tr. 46-47; D.E. 9-3 at pp. 47-48).

When she said that she loves everybody, she meant that she does not hate anyone.  But she does not like to be around people because they judge her and that makes her depressed.  Her romantic relationships end because men expect her to be perfect and she is not (Tr. 47; D.E. 9-3 at p. 48).

Plaintiff was hospitalized multiple times for suicide attempts and depression (Tr. 47-48; D.E. 9-3 at pp. 48-49).  She does not do drugs but drinks alcohol occasionally.  She had not had a drink since the previous month (Tr. 48-50; D.E. 9-3 at pp. 49-51).

Plaintiff cries when she gets her feelings hurt, which can happen when someone speaks to her, even when they are not being mean or trying to hurt her feelings.  It happens often when she talks to people.  She does not like to go outside because she feels like people are judging her.  Looking for a job makes her anxious, as does ordering at a

10 / 21

fast food counter because she believes that the people behind her are getting impatient.  If she goes somewhere, she needs to have someone with her because she starts feeling nervous and scared.  When she goes shopping she takes her daughter.  She still gets angry but she has learned not to be violent (Tr. 51-54; D.E. 9-3 at pp. 52-55).

Plaintiff has tried a lot of medications but none of them seems to be effective.  She thinks Zoloft is effective, but it makes her gain weight (Tr. 54-55; D.E. 9-3 at pp. 55-56).

When she was released from juvenile incarceration, she applied for SSI and was granted benefits quickly.  She was hospitalized various times before she went to prison (Tr. 56-58; D.E. 9-3 at pp. 57-59).  Her Trazadone was discontinued because she told the doctor that she thought it made her sleepy and her anti-depression medication was increased (Tr. 58-59; D.E. 9-3 at pp. 59-60).  If they ever find a drug combination that works for her, she is going to be happy and try to work and raise her daughter (Tr. 60; D.E. 9-3 at p. 61).

The ALJ asked the VE whether jobs exist in the national economy for a younger individual with a GED and no past work.  The person would be the same age as Plaintiff and have the same education and work experience.  The person would have no physical limitations, but would be limited to unskilled work where there is a regular rate of performance throughout the day.  The VE was to rule out jobs requiring strict quotas or time limits for their performance, such as fast food jobs with peak hours and off hours.  The person would be limited to jobs where she could be around other people, but there would be no requirement that she have more than occasional interaction with the general

public, coworkers, or supervisors, and she would need a job that she performed alone and not a type of team effort (Tr. 62; D.E. 9-3 at p. 63).

The VE testified that such a person could do the jobs of housekeeper or kitchen helper, both of which are unskilled and exist in significant numbers in the national economy. If a person missed part of the day once a week because she came in late or left before the end of her shift, it would be considered excessive absenteeism. If a pattern of absenteeism developed, the person would be terminated from any unskilled job. Missing two or more days each month also would be considered excessive absenteeism. A person who was off task up to a third of the day occasionally also would not be able to maintain employment (Tr. 62-63; D.E. 9-3 at pp. 64-65).

An unskilled job usually requires a thirty-day learning period where an employee works with a supervisor or another employee to learn the job. After the thirty-day period, if a person needed the same level of supervision in the job as during the training period, she would be terminated, unless some sort of accommodation were available (Tr. 65; D.E. 9-3 at p. 66).

## **LEGAL STANDARDS**

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*.; *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The burden has been

described as more than a scintilla, but lower than a preponderance.  *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012).  "Substantial evidence is more than 'a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"  *Marcantel v. Chater*, 58 F.3d 637 at *1 (5th Cir. 1995)(not selected for publication)(citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present.  But the Court does not reweigh the evidence, try the issues de novo, or substitute its judgment for that of the Commissioner.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  Conflicts of evidence are for the Commissioner rather than the courts to decide.  *Id.*  It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors:  (1) objective medical evidence or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history.  *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)(citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work.  *Martinez v. Chater*, 64 F.3d

172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520.  The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

## DISCUSSION

In the opinion issued on March 2, 2016, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period since June 23, 2014, the application date.  She further found that Plaintiff had the following severe impairments: bipolar disorder and generalized anxiety disorder.  Although the consultative examiner noted that Plaintiff appeared to be of borderline intellectual functioning, the ALJ found that there was no evidence in the record to support such a conclusion.  The ALJ further found that none of Plaintiff's impairments met or medically equaled a listed impairment. The ALJ next determined that Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but was limited to unskilled work with a regular rate of performance during the day.  She could be around people, but could have no more than occasional interaction with coworkers, supervisors, and the general public.  The ALJ next found that jobs exist in significant numbers in the national economy that Plaintiff can perform (Tr. 14-19; D.E. 9-3 at pp. 15-20).

Plaintiff objects to these findings and argues that she is disabled by her mental impairments.  Defendant counters that the ALJ decision is supported by substantial evidence.  Although Plaintiff did not file a brief setting out particular arguments, at the hearing she stated that she cannot work because she cries a lot, cannot concentrate, and has panic attacks.  She also said that she has to do things a certain way and could not

learn to do something like washing dishes in a way that an employer would want her to.

Accordingly, the ALJ's conclusions regarding Plaintiff's credibility and Residual

Functional Capacity (RFC) will be addressed.

### A.  Plaintiff's Credibility

Plaintiff testified at the hearing that she cannot work because she cries a lot, has

debilitating panic attacks, cannot concentrate long enough to learn a job and feels a

compulsion to do tasks in a particular manner.  Social Security Ruling[4] 96-7P, 1996 WL

374186 (S.S.A.)[5] addresses evaluation of symptoms in disability claims and in particular,

the credibility of an individual's statements.  According to the ruling, the ALJ must

consider whether there is an underlying medically determinable physical or mental

impairment that could reasonably be expected to produce the individual's pain or other

symptoms.  The ALJ must next evaluate the intensity, persistence, and limiting effects of

the individual's symptoms to determine the extent to which the symptoms limit the

individual's abilities to do basic work activities.  If the individual's statements regarding

the intensity, persistence, or functionally limiting effects of pain or other symptoms are

not substantiated by objective medical evidence, the ALJ must consider the entire case

record, including medical signs and laboratory findings, the individual's own statements

about the symptoms, any statements and other information provided by treating or

---

[4]  Social Security Rulings are not binding on the court, but may be consulted when the statute at issue provides little guidance.  The Fifth Circuit has frequently relied upon the rulings in evaluating ALJ decisions.  *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001)(citations omitted).

[5]  SSR 96-7P was rescinded and replaced by SSR 16-3P,  2016 WL1119029 (S.S.A.), effective March 16, 2016.  At the time the ALJ made her decision, SSR 96-7P was in effect and her decision is analyzed in terms of the ruling in effect at that time.

examining physicians, psychologists, or other persons about the symptoms and how they affect the individual, and any other relevant evidence.

In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by objective medical evidence, SSR 96-7P sets out the following factors, outlined in 20 C.F.R. 404.1529(c), which the ALJ should consider: (1) the individual's daily activities;  (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;  (3) factors that precipitate and aggravate the symptoms;  (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms, such as lying flat, standing for 15 to 20 minutes every hour or sleeping on a board; (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Finally, the Ruling sets forth the standard for making credibility determinations:

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statement and the reasons for that weight.  This documentation is necessary in order to give the individual a full and fair

review of his or her claim and in order to ensure a well-reasoned determination or decision.

SSR 96-7P, 1996 WL 374186 at *4.

In this case, the ALJ discounted Plaintiff's testimony regarding the disabling effects of her impairments for several reasons. First, he said that she has not pursued treatment on a regular basis and missed appointments at MHMR in July and September 2014. She was seen at MHMR in October 14 and January 2015, when she did not report any symptoms. She began treatment with Dr. Capitaine in March 2015 and saw him in April and May 2015, but then did not return until August 2015. The ALJ opined that if Plaintiff's condition were not severe enough for her to seek treatment on a continuous and on-going basis, that it is difficult to accept the assertion that it is disabling (Tr. 18).

The ALJ also noted that the prison mental health records showed that Plaintiff was not always compliant with her medication regimen and that she presented with no significant signs of depression, psychosis, distress, or aggression, and her mental status examination was normal. The ALJ found that the lack of consistent treatment and findings of severe mental illness undermined her credibility (*Id.*).

According to SSR 96-7P, a plaintiff's statements may be found not credible if the level of treatment is inconsistent with the level of complaints, or if records show that the plaintiff is not following the treatment prescribed and there is no good reason for the failure. However, the ALJ must consider explanations from the plaintiff explaining the failure to seek prescribed treatment because the explanations may provide insight into the plaintiff's credibility. One of the factors the ALJ must consider is whether the plaintiff

can afford treatment or has access to free or low-cost medical services. *Id.*, 1996 WL 374186 at *8.

At the hearing, Plaintiff explained that she did not see Dr. Capitaine from May 2015 until August 2015 because she thought that when she lost her food stamps, she lost her eligibility for Medicaid. However, she did not explain why she missed appointments in 2014. Also, the ALJ's conclusion that the level of treatment, which consisted primarily of a prescription for Zoloft and some other anti-depressant medications, is not consistent with disabling mental illness, is supported by the record.

The ALJ also pointed to Plaintiff's testimony that she did not have any friends, although she also stated that she "loves everybody" and a friend took her to the hearing. The Plaintiff also testified that she cannot go out by herself, but also stated that she enjoys going to the grocery store and Walmart. Also, although Plaintiff testified that she has a ritual for washing dishes, there was no mention of this in any of the records and no diagnosis of obsessive-compulsive disorder (*Id.*).

The ALJ articulated reasons grounded in the evidence for finding that Plaintiff's allegations of disabling mental illness were not wholly credible. Accordingly, her determination regarding Plaintiff's credibility is supported by substantial evidence.

## B. Residual Functional Capacity

A claimant's RFC is an assessment of her ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, which means eight hours per day, five day per week, or an equivalent work schedule. *See* SSR 96-8p at *1, 1996 WL 374184 (S.S.A.). In assessing RFC, the adjudicator must consider

all of an individual's impairments, including those that are "not severe." *Id.* at *5.  The ALJ determined that Plaintiff can do a full range of work at all exertional levels, but is limited to unskilled work with a regular rate of performance during the day and that she can have no more than occasional interaction with coworkers, supervisors, and the general public.

These limitations are consistent with the evidence in the record because they take into account limitations on Plaintiff's ability to concentrate and interact with people. Accordingly, the RFC assessment made by the ALJ is supported by substantial evidence.

### C.  Submission of New Evidence

Plaintiff submitted a copy of a form dated March 6, 2017 which was completed by a psychiatrist and stated that she is permanently disabled by major depression with psychosis (D.E. 1 at pp. 7-8).  A district court does not issue factual findings on new evidence, but is limited to determining whether to remand for the consideration of newly presented evidence.  *Haywood v. Sullivan*, 888 F.2d 1463 (5th Cir. 1989).  In order to be considered, evidence submitted after the close of the administrative proceeding must be new and material and good cause must be shown for the failure to incorporate such evidence into the record in a prior proceeding.  *Dorsey v. Heckler*, 702 F.2d 597, 604 (5th Cir. 1983).  To meet the materiality requirement, there must be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination had it been before him.  *Id.* (citing *Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981)).  In addition, new evidence must relate to the time period for which benefits were denied, and must not concern evidence of a later-acquired disability or of the subsequent

deterioration of the previously non-disabling condition. *Haywood*, 888 F.2d at 1471 (citing *Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir. 1985)).

The evidence submitted by Plaintiff is dated approximately one year after the ALJ's decision denying her benefits and is too remote in time to the ALJ's determination to be relevant. Also, the diagnosis appears to represent a deterioration of her condition because no other mental health care provider during the relevant time period had diagnosed her with psychosis or found that she is permanently disabled by her mental health impairments. Accordingly, Plaintiff has failed to show that her case should be remanded for consideration of the new evidence.[6]

## **RECOMMENDATION**

Based on the foregoing, it is respectfully recommended that Plaintiff's motion to reverse the determination of the Commissioner and remand her case for additional administrative proceedings (D.E. 1) be DENIED. The Commissioner's determination that plaintiff is not disabled is supported by substantial evidence and should be AFFIRMED.

Respectfully submitted this 19th day of December, 2017.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

---

[6] The form completed by the psychiatrist is a "Medical Release/Physician's Statement" provided by the Texas Health and Human Services Commission to Plaintiff's physician. Thus, it appears that Plaintiff may have filed a new claim for SSI benefits. If she has not done so, she is, of course, free to file a new application for SSI based on the new evidence.

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(*en banc*).